IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**RUBEN G. LOPEZ,**

       **Plaintiff,**

**vs.**                                                    **No.  06cv0242 DJS**

**JOANNE B. BARNHART,**
**COMMISSIONER OF SOCIAL SECURITY,**

       **Defendant.**

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Plaintiff's (Lopez's) Motion to Reverse or Remand for a Rehearing **[Doc. No. 16]**, filed June 1, 2007, and fully briefed on September 18, 2007.  On January 24, 2005, the Commissioner's Administrative Law Judge (ALJ) found Lopez was not disabled and denied Lopez's application for disability insurance benefits and supplemental security income payments.  Lopez appealed the ALJ's decision to the Appeals Council.  On January 23, 2006, the Appeals Council upheld the ALJ's findings for the alleged onset date, July 10, 2002, through October 20, 2004.  However, the Appeals Council reversed the ALJ's decision for the time period after October 20, 2004, finding Lopez disabled as of that date.  Lopez seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).  Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds that the motion to remand is well taken and will be **GRANTED**.

**I.  Factual and Procedural Background**

Lopez, now fifty-three years old (D.O.B. 11/1/1954), filed his application for disability insurance benefits and supplemental security income on November 21, 2002, alleging disability since July 10, 2002, due to diabetes mellitus, history of spondyloarthropathy, mild carpal tunnel syndrome on the left, status-post right carpal tunnel release, status-post coronary artery bypass grafting x 4, and ischemic heart disease.  Tr. 37.  Lopez has a high school education and past relevant work as a home health care worker, janitorial worker and groundskeeper.  *Id.*

On January 24, 2005, the ALJ denied benefits.  The ALJ found Lopez's impairments, although severe within the meaning of the Regulations, were not severe enough to meet or medically equal, singly or in combination, one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.  Tr. 37.  The ALJ further found Lopez retained the residual functional capacity (RFC) to perform sedentary work.  Tr. 40.  Lopez filed a Request for Review of the decision by the Appeals Council.  On January 23, 2006, the Appeals Council granted Lopez's request for review of the ALJ's decision.  Tr. 10-12.  The Appeals Council upheld the ALJ's findings for the alleged onset date, July 10, 2002, through October 20, 2004.  However, the Appeals Council reversed the ALJ's decision for the time period after October 20, 2004, finding Lopez disabled as of that date.  Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes.  Lopez seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether she applied correct legal standards. *Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994).  "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Moreover, "all of the ALJ's required findings must be supported by substantial evidence," *Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence of record must be considered in making those findings, *see Barker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989).  "[I]n addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects."  *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996).  Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met.  *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

## III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last

for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity. *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)).  The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. 20 C.F.R. § 404.1520 (a-f).  The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled. *Thompson v. Sullivan*, 987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show he is not engaged in substantial gainful employment, he has an impairment or combination of impairments severe enough to limit his ability to do basic work activities, and his impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or he is unable to perform work he had done in the past. 20 C.F.R. §§ 404.1520 and 416.920.  At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering his residual functional capacity, age, education, and prior work experience. *Id.*

In support of his motion to reverse, Lopez makes the following arguments: (1) the ALJ failed to consider the effects of his carpal tunnel syndrome; and (2) the ALJ erred in finding that his depression was not severe.  Lopez also argues the Appeals Council erred in applying the Medical-Vocational Guidelines (the grids) to deny benefits for the time period prior to October 31, 2004, and failed to consider his impairments in combination.  Lopez maintains the Appeals Council should have remanded to the ALJ for a new hearing and should have required the ALJ to consult with a vocational expert.

**A.  Conclusive Application of the Grids**

Lopez contends the ALJ and the Appeals Council erred in conclusively applying the grids in finding he was not disabled prior to October 31, 2004.  Lopez also argues the ALJ's finding at step two of the sequential evaluation process that his carpal tunnel syndrome was severe is inconsistent with the conclusive application of the grids at step five.

**1.  The Medical-Vocational Guidelines**

The grids represent the Commissioner's administrative notice of the jobs that exist in the national economy at the various functional levels (i.e. sedentary, light, medium, heavy, and very heavy).  *See Channel v. Heckler,* 747 F.2d 577, 579 (10th Cir. 1984).  If the ALJ's findings of fact regarding a particular individual's age, education, training, and RFC all coincide with the criteria of a particular rule on these grids, the Commissioner may conclude that jobs suitable for the claimant exist in the national economy and that the claimant therefore is not disabled.  *Id.*

Because the grids classify RFC based only on exertional or physical strength limitations, they may not be fully applicable to claimants with nonexertional impairments.  See 20 C.F.R.§ 404.1567; *Channel v. Heckler,* 747 F.2d at 580-81.  Nonexertional impairments are medically determinable impairments, including pain, that do not directly limit physical exertion, but may reduce an individual's ability to perform gainful work nonetheless.  *Id.* at 580.

If nonexertional impairments narrow the range of possible work the claimant can perform, the Commissioner may only use the grids as a "framework" for determining whether, in light of all claimant's impairments, he has meaningful employment opportunity within the national economy. 20 C.F.R. pt. 404, subpt. P, App.2, 200 (e) (2).  In such cases, the Commissioner must also produce a vocational expert to testify whether specific jobs appropriate to claimant's limitations

exist in the national economy.  *Channel*, 747 F.2d at 581.  In other words, "an ALJ may not rely conclusively on the grids unless he finds . . . that the claimant has <u>no significant nonexertional impairment</u>."  *Thompson*, 987 F.2d at 1488 (emphasis added).

In this case, the ALJ found:

> An impairment is "severe" within the meaning of the regulations if it imposes more than minimal limitations on claimant's ability to perform basic work activities.  The evidence demonstrates that claimant has impairments (diabetes mellitus; history of spondyloarthropathy; mild carpal tunnel syndrome on the left; status-post right carpal tunnel release; status-post coronary artery bypass grafting x4; ischemic heart disease), which impose **more than minimal limitations on his ability to perform regular work-related activities** and can be considered as "severe" within the meaning of 20 C.F.R. 404.1520(C) and SSR 96-3p.

Tr. 37.  However, the ALJ also found:

> After careful consideration of the entire record, the Administrative Law Judge finds that claimant remains capable of performing sedentary work. Sedentary work [is] generally defined as work involving lifting of no more than 10 pounds at a time with occasional lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing on occasion is often necessary in carrying out job duties.  There is no evidence which demonstrates that claimant is physically incapable of performing most of the activities which define sedentary work.  He can lift up to 20 pounds occasionally and his ability to sit is unlimited.  He can stand for up to one hour and walk for two-to-three blocks without onset of severe symptom exacerbations. Said findings are consistent with claimant's subjective estimations of his functional abilities and reflect consideration of decreased exercise tolerance suggested by Thallium stress testing. There is no specific impairment of gait or station that could reasonably be expected to hinder occasional standing or walking.  This assessment is further supported by the diagnostic and clinical findings shown in the record and places considerable weight on the findings and remarks of the treating cardiologist, who specifically indicated that he remained unconvinced that claimant's subjective complaints of chest pain were cardiac in origin.  (Exh. 14F/9). While a degree of limitation can be inferred given claimant's history of cardiac problems and the diagnostic findings shown following bypass surgery, said limitations are not of a magnitude that precludes all work.  There was obviously a good medical result following bypass surgery as ejection fraction remains good and one cardiac test showed that claimant maintained a good aerobic capacity.  Claimant's testimony, when considered in the context of the full record, does not warrant further reduction of his residual functional capacity.
>
> \* \* \*
>
> Reduction in residual functional capacity to a sedentary exertional range also reflects consideration of the other medically determined impairments of diabetes mellitus, claimant's

>history of spondyloarthropathy, mild carpal tunnel syndrome on the left and the right-sided carpal tunnel release.  It is noted that since the time of cardiac bypass, no significant complaints consistent with severe functional compromise have been recorded relative to the above-mentioned impairments.  Claimant's diabetes is obviously under good control as there have been no emergency room visits for dangerously high blood glucose levels.  Further, there have been no medical findings indicative of diabetic neuropathy, retinopathy or end-organ damage.  The degree of carpal tunnel syndrome on the left has never been characterized as greater than mild and the absence of recent right upper extremity complaints indicates that the carpal tunnel release was successful.  **The mild degree of carpal tunnel on the left cannot be found to result in limitations on work activities that fall within the range of sedentary exertion.**  Spondyloarthropathy is a remote diagnosis with no recent documentation of related manifestations.

Tr. 37, 40-41 (emphasis added).

An impairment is "severe" if it **significantly limits** a claimant's physical or mental ability to do basic work activities.  See 20 C.F.R. §§ 404.1520(c), 416.920(c)(emphasis added).  In this case, although the ALJ found Lopez's carpal tunnel syndrome of his left hand was "severe" at step two of the sequential evaluation process, nonetheless, at step four, the ALJ found it insignificant.  This was error.  *See Sandoval v. Barnhart*, 197 Fed.Appx. 801 (10th Cir. 2006)(ALJ's finding that claimant's back pain was severe at step two made it impossible to conclude at step four that claimant's pain was insignificant).

In addition, the medical records regarding Lopez's complaints of hand pain do not support the ALJ's characterization that "[t]he mild degree of carpal tunnel on the left [could not] be found to result in limitations on work activities that fall within the range of sedentary exertion."

On November 15, 2002, Eleana Zamora, M.D., examined Lopez.  Tr. 149-152.  Dr. Zamora noted Lopez had "significant pain in his hands bilaterally" and "**marked deformity of his hands that limits his ability to work**."  Tr. 149.  Dr. Zamora performed a physical examination and noted: "**Marked deformity of the hands bilaterally**.  He has **ulnar deviation bilateral**

7

**hands**. He has synovitis[1] evident in his PIP's (proximal interphalangeal joints) and MCP's (metacarpophalangial joints). He has subcutaneous nodules on his fingers." Tr. 150 (emphasis added).

On January 14, 2003, Wilmer L. Sibbit, M.D., Professor of Rheumatology at UNM Hospital evaluated Lopez . Tr. 187-188. Lopez complained of "pain and swelling in his hands and fingers for 2 to 3 years, although he state[d] it is [was] much worse lately." Tr. 187. In a letter to Dr. Zamora, Dr. Sibbit noted:

> Assessment: This is a 48 year-old male with a history of HLAB-27 arthropathy who presents now with complaint of 3 years of increasing hand swelling and pain. Differential diagnosis for this gentleman includes carpal tunnel syndrome, gout, diabetic hand syndrome and diabetic neuropathy.
>
> Plan:
> 1.  We will obtain hand x-rays.
> 2.  We will refer the patient for nerve conduction studies to rule out carpal tunnel syndrome.
> 3.  We will obtain laboratory data including a chem-10, uric acid level, rheumatoid factor, ESR, CPR and we will start he patient on Narproxen, 500 mg/po/bid/prn and Colchicine, .6mg/po/bid.

Tr. 187-188.

On January 21, 2003, Dr. Zamora evaluated Lopez for "chief complaint of hand pain." Tr. 180-182. Dr. Zamora noted in pertinent part:

> **HISTORY OF PRESENT ILLNESS**:
>
> The patient is a 48 year old male with a history of coronary artery disease, hypertension, diabetes, depression, and HLAB-27 spondyloarthropathy, who is here for hand pain.
>
> 1.  Hand pain. The patient has had a complaint of **hand pain for the last several months, which has been increasing in severity**. He was seen by the Rheumatology Clinic on Janaury 14, 2002. At that time, a differential diagnosis for his hand pain and swelling included carpal tunnel syndrome, gout, diabetic hand syndrome, and

---

[1] Synovitis is inflammation of a synovial membrane, especially that of a joint; in general, when unqualified, the same as arthritis. http://www.stedmans.com/section.cfm/45.

> diabetic neuropathy. Work-up for these is currently on going and the patient is to obtain x-rays and labs tomorrow. In the meantime, he has been started on Naproxen 500 mg twice a day as needed and Colchicine 0.6 mg twice a day. He has not noticed any relief with these medications. He is also taking Bextra and Ibuprofen. He states that he has bilateral hand and wrist pain. He has morning stiffness, which can last three to four hours. **He has markedly decreased movement in his finger and wrist joints bilaterally**. He denies any elbow or knee pain. He has chronic back pain.
>
> \* \* \*
>
> Musculoskeletal [examination] shows that the **patient has marked deformity of the DIPs (distal interphalangeal joints) and PIPs bilaterally of the upper extremities. He also has limited flexion and extension of his wrists bilaterally**. Elbows and knees are within normal limits.
>
> **OBJECTIVE**:
>
> This is a 48 year old male with a history of HLAB 27 spondyloarthropathy, depression, coronary artery disease and diabetes, who is here for hand pain.
>
> 1. Hand pain. The patient is currently being work-up by the Rheumatology Clinic, but continues to have **severe bilateral hand pain, which is limiting his ability to work and do leisure activities**. Great concern that with his diabetic nephropathy, his is currently taking Bextra, naproxen sodium, and ibuprofen. As this patient is at a higher risk of renal failure, we have advised him to stop taking both the Naproxen and Ibuprofen. He is to continue with the Bextra. **We will also provide him with Oxycodone to take as needed for breakthrough pain.** He should continue with the remainder of his Rheumatology work-up including his labs and x-rays tomorrow. We will see him back in one to two months to follow-up on his pain, although he is advised to call the clinic should he feel that his pain is not being well controlled.

Tr. 180-182 (emphasis added).

On February 20, 2003, Dr. Zamora evaluated Lopez. Tr. 177. Lopez complained his pain was still significant. Lopez was taking ibuprofen, naproxen sodium and Bextra for his pain. Dr. Zamora had prescribed oxycodone but Lopez had not filled the prescription. Dr. Zamora wrote another prescription for oxycodone and directed Lopez to take it as needed for arthritis pain. Tr. 178.

On February 20, 2003, Joseph M. Bicknell M.D., professor of neurology at UNM Hospital, performed an EMG/nerve conduction study.  Tr. 175, 201.  **Lopez had complained of numbness and pain in the fingers and hands and locking of the fingers**.  **The EMG indicated Lopez suffered from carpal tunnel syndrome of the left hand**.

On March 18, 2003, Lopez returned for a follow up of his carpal tunnel with Dr. Zamora.  Tr. 240.  Dr. Zamora noted: "**Musculoskeletal exam is remarkable for decreased grip strength in the bilateral hands, right worse than left, marked thenar atrophy on the left with mild thenar atrophy on the right.  He does have subcutaneous nodules on the right**."  Tr. 240 (emphasis added).  Dr. Zamora assessed Lopez in pertinent part as follows:

> **Assessment Plan**:
> This is a 48 year old male with multiple medial (sic) problems who is here to follow up on bilateral hand pain.
>
> 1.   Carpal tunnel syndrome– nerve conduction studies showed carpal tunnel syndrome on the left hand.  The right nerve conduction study was normal.  The patient is given bilateral hand splints to wear them at night.  He is to continue with his Bextra.  He will i**ncrease his Oxycodone from 5-10 mg every six hours as needed**.  At his next clinic visit, should this pain medication not be working we will place him on a long-acting pain medication with Oxycodone for pain.

Tr. 241 (emphasis added).

On April 15, 2003, Lopez returned for a follow up with Dr. Zamora.  Tr. 237-238.  Dr. Zamora noted the nerve conduction studies showed carpal tunnel syndrome on the left and borderline on the right.  Tr. 237.  Lopez reported "a worsening in the weakness and pain in his hands." *Id.*  Lopez was wearing bilateral hand splints and taking oxycodone for the pain but complained it nauseated him and made him sleepy.  Dr. Zamora referred Lopez to Hand Surgery for evaluation.  Tr. 238.

On May 19, 2003, Stuart C. Marshall, M.D., professor of Orthopaedics at UNM Hospital, evaluated Lopez. Dr. Marshall noted in pertinent part:

**Physical Exam:**

The patient has a positive compression test, positive Phalen's test, negative Tinel's test. His grip in his left hand is 26 pounds, his right is 14 pounds. His pinch is 21 pounds on the left and 23 on the right. Light touch sensation is diminished in his right hand in the median nerve distribution. He has difficulties with two-point sensation in his thumb, index, middle and ring finger. He also has difficulties with two-point sensation in his small finger on the right. There is no thenar or hypothenar atrophy.
\* \* \*

**Impression**:

Carpal tunnel syndrome symptoms.

**Plan**:

The patient was seen and examined by Dr. Cheema. At this point there is no objective nerve problem on the right. The patient is having some subjective complaints and decreased grip strength. For this reason we will inject his carpal tunnels with some Dexamethasone and some Lidocaine and see him back in four weeks to see if he has improved. In the meantime, he will continue wearing the gauntlet splints.

Tr. 245.

On June 19, 2003, Lopez returned for a follow up with Dr. Zamora. Tr. 257-259. **Dr. Zamora reported Lopez continued to have significant discomfort secondary to carpal tunnel syndrome**.

On June 19, 2003, Dr. Zamora requested a consultation with "Orth, Hand surgery." Tr. 253. Dr. Zamora noted:

Reason for consultation:

48 yo man with **bilateral carpal tunnel syndrome**. **Pain not controlled with narcotics and splints and pain is worsening. Significant bilateral hand weakness**. Was seen in your clinic in May 2003 and had bilateral steroid injections that have not helped his pain. Please evaluate for possible release.

Tr. 253 (emphasis added).

On July 18, 2003, Dr. Cheema, Associate Professor in the Department of Orthopaedics, Hand Surgery Department, evaluated Lopez. Tr. 264-265. Dr. Cheema assessed Lopez with "right carpal tunnel syndrome as well as a **left long finger trigger finger**."[2] Tr. 264. Dr. Zachary B. Adler, House Officer, Department of Orthopaedics, noted:

> **PLAN**:
>
> Plan is for carpal tunnel release on the right on 08/05/03. Patient was explained all the risks and benefits of this procedure and **adamantly wanted to proceed for pain relief and in the hopes of increasing his strength in his right hand**. After this operation the patient is to return to clinic on 08/15/03. **The patient was also offered a left long finger trigger release but the patient stated that he wanted to continue to work and clean himself so did not desire surgery on both hands. After he recovers from his right carpal tunnel release, he would like to proceed with a left long finger trigger release**. The patient was seen and examined by Dr. Cheema. The patient is to return to clinic on 08/15/03 after his operation on 08/05/03.

Tr. 264-265 (emphasis added).

On August 15, 2003, Lopez returned for his follow up with Dr. Cheema. Tr. 379. Dr. Cheema noted Lopez had a right carpal tunnel release and noted: "The patient did not report any pain, and reports that the symptoms of carpal tunnel syndrome, which he had prior to the procedure, have now resolved." Tr. 379.

On May 18, 2004, Lopez had a Neuropsychological Assessment performed at the UNM Center for Neuropsychological Services. Tr. 413-418. Henry C. Koehn, Ph.D., Neuropsychology Fellow, and Richard Campbell, Ph.D., Clinical Neuropsychologist, performed the assessment. However, because Lopez's carpal tunnel affected his motor functioning

---

[2] According to the American Academy of Orthopaedic Surgeons a "trigger finger" occurs when the motion of the tendon that opens and closes the finger is limited, causing the finger to lock or catch as the finger is extended. http://orthinfo.aaos.org/topic.cfm?topic=A0024.

performance, "no further testing of motor function [as to his upper extremities] was attempted." Tr. 417.

At the administrative hearing, Lopez informed the ALJ that one of his problems was his carpal tunnel. Lopez stated, "I have had surgery for carpal tunnel. I've got to get my left hand done, I already had my right hand done. And I've been to a neuropsych because I suffer from severe depression, I have real bad memory loss since the surgery, I've had a real bad memory loss." Tr. 444. The ALJ did not follow up with any questions regarding any of these problems, responding, "That's normal." *Id.*

## 2. Sedentary Work Under the Regulations

"Under the regulations, 'sedentary work' represents a significantly restricted range of work." SSR 96-9p, 1996 WL 374185, at *3 (July 2, 1996). In her decision, the ALJ found:

> The Medical-Vocational Guidelines have been considered in light of claimant's residual functional capacity and vocational profile. The Medical-Vocational Guidelines at 20 C.F.R. P. 404, subpt. P, App. 2 reflect an analysis of the various vocational factors in combination with an individual's residual functional capacity in evaluating the ability to engage in substantial gainful activity in other than vocational relevant past work. Included in the rules is administrative notice of the numbers of unskilled occupations that exist throughout the national economy at the various functional levels with approximately 1,200 **unskilled sedentary occupations** recognized. (Section 201.00, App. 2, Subpart P, Pt. 404). When all relevant factors coincide with the criteria of a rule, the existence of such jobs and the ability to perform them is established.

Tr. 41 (emphasis added). However, Social Security Ruling 96-9p directs:

> Manipulative limitations: **Most unskilled sedentary jobs require good use of both hands and the fingers; i.e., bilateral manual dexterity. Fine movements of small objects require use of the fingers; e.g., to pick or pinch. Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions.**
>
> Any significant manipulative limitation of an individual's ability to handle and work with small objects with both hands will result in a significant erosion of the unskilled sedentary occupational base. For example, example 1 in section 201.00(h) of appendix 2, describes an individual who has an impairment that prevents the performance of any sedentary occupations that require bilateral manual dexterity (i.e., "limits the individual to sedentary jobs which do not require bilateral manual dexterity"). **When the limitation is less significant, especially if the limitation is in the non-dominant hand, it may be useful to consult a vocational resource**.

SSR SSR 96-9p, 1996 WL 374185, at *8 (July 2, 1996)(emphasis added). In this case, it is clear from the record that Lopez's left carpal tunnel syndrome had more than a minimal affect on his ability to perform basic work activities. Accordingly, the ALJ erred in conclusively applying the grids. On remand, the ALJ should consult with a vocational expert.

14

## B.  Step Two Finding of Depression as Non-severe

At step two of the sequential evaluation process, the claimant bears the burden to demonstrate that he has a medically severe impairment or combination of impairments that significantly limits his ability to do basic work activities.  20 C.F.R. §§ 404.1520(c), 416.920(c); *see also, Bowen v. Yuckert*, 482 U.S. 137, 146 & n.5 (1987).  Basic work activities are "abilities and aptitudes necessary to do most jobs," and include the ability to understand, remember, and carry out simple instructions; to use judgment; to respond appropriately to supervisors, co-workers, and usual work situations; and to deal with changes in a routine work setting.  20 C.F.R. §§ 404.1521(b)(3)-(6), 416.921(b)(3)-(6).

The step two severity determination "is based on medical factors alone, and . . . does not include consideration of such vocational factors as age, education, and work experience." *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cr. 1988); 20 C.F.R. §§ 404.1520(c), 416.920(c). Although step two requires only a "de minimis" showing, the mere presence of a condition or ailment documented in the record is not sufficient to prove that the plaintiff is significantly limited in the ability to do basic work activities, *see Hinkle v. Apfel*, 132 F.3d 1349, 1352 (10th Cir.1997).   To meet his burden, Lopez must furnish medical and other evidence to support his claim.  *Bowen v. Yuckert*, 482 U.S. at 146 & n.5.

The Court has carefully reviewed the record and finds that substantial evidence does not support the ALJ's finding that the functional impact of Lopez's  "signs and symptoms of depression" was minimal.  (Tr. 40).  There is evidence in the record that Lopez suffered from significant depression.  *See e.g.* Tr. 180 ("He is requesting treatment for his depression.  His depression is likely both major depression exacerbated by medical problems.  We will start him on

15

Celexa 20 mg once a day."); Tr. 257 ("The patient has been complaining of depression for several months.  He is having difficulty sleeping and has frequent nightmares.  He also states he is very anxious."); Tr. 414 ("Mr. Lopez developed depression and this also has not improved significantly.  He reported chronic anhedonia, sadness, sleep disturbance, thoughts of death, and feelings of worthlessness."); Tr. 417 ("His ongoing significant depression and general level of psychiatric distress is believed to have limited his ability to focus an sustain his attention, although mild impairment secondary to his medical condition cannot be ruled out.  Additionally, his depression is the likely cause of his difficulty sustaining optimal effort, as evidenced by his frequent surrendering on more effortful tasks.").  Accordingly, the Court will remand this action to allow the ALJ to reconsider her step two finding regarding Lopez's depression.

      A judgment in accordance with this Memorandum Opinion and Order will be entered.

_____
**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**